IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:17-cr-234-AT |
| JOHN HOLLAND, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER

This criminal case, alleging violations of the Anti-Kickback Statute, has been pending since 2017. The events at the core of this case occurred between 2000 and 2013. During this case's long life, numerous witnesses have died or become unavailable, at least some evidence has been lost, and memories have inevitably faded. Mr. Holland has filed three motions to dismiss for speedy trial violations, and Mr. Moore and Mr. Cota have each filed two such motions. The most recent round of speedy trial motions is before the Court. Defendants argue that the case should be dismissed because their rights under the Speedy Trial Act and the Sixth Amendment have been violated. [Docs. 675, 677, 679].

As explained below, the Court finds that far more than 70 non-excludable days have passed since Defendants were arraigned and so the Speedy Trial Act clock has run. As the Speedy Trial Act has been violated, the Court must dismiss this case. Having considered the statutory factors to assess whether dismissal

should be with or without prejudice, the Court concludes that the circumstances of this case warrant dismissal with prejudice.

Additionally, the Court finds that the Government has violated Defendants' Sixth Amendment speedy trial rights under the analysis set out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). For this alternative reason, this case should be dismissed with prejudice. For these two separate reasons, the Court **GRANTS** Defendants' Motions [Docs. 675, 677, 679] and **DISMISSES** this case **WITH PREJUDICE**.

## I.    Background

### A.    The Alleged Unlawful Conduct

When viewed in full context, this case has a history that spans a quarter century. The alleged crimes occurred between 2000 and 2013. (Second Superseding Indictment, Doc. 121). As alleged, individuals working for Tenet Healthcare Corporation ("Tenet") and Clinica de la Mama ("Clinica") negotiated and agreed to unlawful referral contracts, whereby Clinica steered and referred undocumented pregnant patients to Tenet hospitals in exchange for payment. (*Id.*) The contracts—which were negotiated with Tenet's and Clinica's legal counsel— involved Clinica's provision of Spanish translation services, as well as other management services, in exchange for payment for those services. (*Id.*) Yet according to the Government, these service contracts were pretextual disguises for unlawful referral agreements. (*Id.*). The Government alleges that Tenet wanted these undocumented patients to deliver at its hospitals so that it would receive payments from state Medicaid payors for the services rendered. (*Id.*) There are no

allegations that any individuals obtained a direct financial benefit from this alleged scheme. There are no allegations that Tenet received government payments for services that were not rendered. And there are no allegations that anyone overcharged government payors based on the services provided.

### B. The Government's Initial Investigation

The Government began investigating Tenet, and this alleged scheme, in May 2012 in a civil *qui tam* action. In 2014, a parallel criminal investigation began involving the same events. In July 2014, the Government brought criminal cases in this district against two individuals—one Clinica executive (Tracey Cota) and one Tenet executive (Gary Lang). *See United States v. Tracey Cota*, 1:14-cr-275-AT, Doc. 1 (N.D. Ga. July 23, 2014); *United States v. Gary Lang*, 1:14-cr-274-AT, Doc. 1 (N.D. Ga. July 23, 2014). Then, in October 2016, the Government brought criminal charges against Tenet hospitals. *United States v. Atlanta Med. Ctr., Inc., et al.*, 1:16-cr-350-AT, Doc. 1 (N.D. Ga. Oct. 3, 2016).[1] The investigation of these events, and the charging of these defendants, occurred in the Northern District of Georgia.

---

[1] Ms. Cota pled guilty to a criminal information alleging one count of conspiracy to pay and receive renumeration in exchange for Medicaid patient referrals in violation of 42 U.S.C. 1320a-7b(b). *See Cota*, 1:14-cr-275, Doc. 7-1 (Aug. 6, 2014). Mr. Lang pled guilty to a criminal information alleging the same sole count. *See Lang*, 1:14-cr-274, Doc. 7-1 (Aug. 7, 2014). Both plea agreements include provisions stating that Ms. Cota and Mr. Lang will cooperate with the Government, and that the Government will make their cooperation known to the sentencing court. Tenet hospitals pled guilty to an information alleging one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, in October 2016. *See Atlanta Med. Ctr., Inc., et al.*, 1:16-cr-350-AT, Doc. 16 (Oct. 19, 2016).

### C.    The Government Charges Mr. Holland in Florida

The story begins for our Defendants in 2017. Even though the alleged events, investigation, and initial cases occurred and were brought in this district, the Government indicted Mr. Holland in the Southern District of Florida in January 2017. Mr. Holland was the former Chief Executive of one Tenet hospital and then Senior Vice President of Operations for Tenet's Southern States Region. Mr. Holland was initially charged with mail fraud, healthcare fraud, and two counts of major fraud against the United States. (Doc. 1). On March 28, 2017, the Government filed a superseding indictment in Florida that charged Mr. Holland with the same crimes and added five counts of wire fraud. (Doc. 42). Mr. Holland's case was initially placed on the Southern District of Florida's "rocket docket," with trial originally set for April 2017, and later moved to July 10, 2017. (Doc. 41). While the case was pending in Florida, the Florida district court ordered (1) that the "ends of justice" would be served by continuing the trial from April 2017 to July 2017, and (2) relatedly, that the period of time "from **March 23, 2017 to July 10, 2017**, and any other trial date set hereafter" would be excludable time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A). (Doc. 41) (emphasis in original).

Counsel for Mr. Holland moved to transfer the case to this district. After various briefing battles, the magistrate judge managing the case in Florida ordered that the matter be transferred to this Court on April 24, 2017. (Doc. 56). The Government challenged that order. (Docs. 57, 59). It was not until June 27, 2017

that the case was ultimately transferred, after the Florida district court judge affirmed the magistrate judge's transfer order. (Doc. 97).

### D. The Case Returns to this District, and New Charges and New Defendants are Added

After the case was transferred to this district in June 2017, Magistrate Judge Salinas held numerous conferences with counsel and entered a new scheduling order. (Doc. 104). The Government initially asked Judge Salinas to hold off ruling on pending motions while it decided whether to pursue a second superseding indictment. (*See* 8/1/17 Hearing Tr., Doc. 600 p. 3–8). On September 26, 2017, the Government obtained the Second Superseding Indictment that added two new Defendants—Mr. Moore and Mr. Cota. (Doc. 121). Mr. Moore served as Chief Executive Officer of another Tenet hospital. Mr. Cota served as the President and CEO of Clinica. The Second Superseding Indictment charged the three Defendants with various crimes including engaging in a conspiracy, in violation of 18 U.S.C. § 371, to violate the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b)(1)(A), (1)(B), (2)(A), and (2)(B), by paying for, or accepting payment in exchange for, the referral of patients. (*Id.*). Mr. Moore and Mr. Cota were arraigned on October 3, 2017. (Docs. 130, 133).

After the new Defendants and new charges were added, Magistrate Judge Salinas entered yet another new scheduling order. (Doc. 136). This order, and numerous subsequent orders, provided for the exclusion of time under the Speedy Trial Act. (Docs. 136, 147, 306, 351, 571). *See infra* at 19–20.

At that point, Defendants and the Government litigated numerous issues before Magistrate Judge Salinas. Judge Salinas issued five reports and recommendations addressing the parties' motions. (Docs. 306, 332, 339, 348, 357). Mr. Holland filed his first motion to dismiss based on a violation of his Sixth Amendment speedy trial right in January 2018. (Doc. 180). That motion was denied. (*See* R&R, Doc. 339 at 33–44, adopted at Doc. 446). While Mr. Moore and Mr. Cota did not join that motion, they did move to dismiss based on pre-indictment delay. (Docs. 177, 199, 205, 261). Those too were denied. (*See* R&R, Doc. 339, adopted at Doc. 446). All Defendants later filed additional speedy trial motions in October 2022, asserting violations of the Speedy Trial Act and their Sixth Amendment speedy trial rights. (Docs. 579, 581, 582, 585). The Court ultimately denied those motions. (Doc. 617-1).

### E. The Unindicted Coconspirators and the Rule 801(d)(2)(E) Statements

While numerous issues have been raised by the parties and resolved by Magistrate Judge Salinas and this Court, one set of issues has required more attention, and caused more delay, than all the rest. These issues involve the Government's naming of 55 unindicted coconspirators and later seeking to introduce nearly 83 out-of-court statements under Fed. R. Evid. 801(d)(2)(E) (explaining that a statement is not hearsay if it was made by the defendants' coconspirator during and in furtherance of the conspiracy). Although this procedural saga is long, it is important to understanding the delay in this case.

On August 14, 2017, the Government sent counsel for Mr. Holland a letter listing 55 alleged unindicted coconspirators. (*See* Doc. 195). In sending this letter, the Government stated that it intended to introduce some number of out-of-court statements from some number of these 55 alleged coconspirators via Fed. R. Evid. 801(d)(2)(E). The Government intended to introduce these statements by having two cooperating Government witnesses—Tracey Cota and Gary Lang—testify to statements made by the other alleged coconspirators. (*See* 10/3/19 Hearing Tr., Doc. 447 p. 88) ("We're not going to call the coconspirators in our case in chief . . . . We are going to call Ms. Cota and Mr. Lang."). Both Tracey Cota and Gary Lang had, at that point, pled guilty to charges brought against them and were awaiting sentencing. The sentencings were delayed so that the Government could provide a sentencing recommendation based on Ms. Cota's and Mr. Lang's cooperation.

After receiving the Government's list of 55 unindicted coconspirators, Defendants, in January 2018, filed motions for *James*[2] hearings to determine the admissibility of any alleged coconspirator statements. (Docs. 195, 218, 223). The Magistrate Judge deferred these motions to the undersigned. (Doc. 331).

Just over a year later, in February 2019, this Court held a hearing to address the unindicted coconspirator and Rule 801(d)(2)(E) issues. At the hearing, the Government explained that it did not necessarily intend to introduce out-of-court

---

[2] *See United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc) (requiring a district court to determine the admissibility of alleged coconspirator statements before those statements can be admitted at trial).

statements from *all* of these 55 alleged coconspirators; however, it was not willing to indicate how many of the 55 alleged coconspirators made out-of-court statements that it would seek to introduce under Rule 801(d)(2)(E). (2/14/19 Hearing Tr., Doc. 424 p. 55–56).

At the same February 2019 hearing, defense counsel voiced a series of concerns about the Government's litigation strategy. First, even being familiar with the facts of the case, defense counsel were unable to determine why many of the names were on the alleged coconspirator list. (*Id.* p. 61). Second, the Government had not advised whether it believed there was a single conspiracy among all 55 people or multiple conspiracies—and if multiple, when any particular conspiracy began and ended. Defense counsel were also not aware what evidence the Government contended showed the alleged coconspirators' knowledge of and intent to join the conspiracy. (*Id.* p. 65). Finally, and most significantly, defense counsel raised the concern that the Government had compiled such an expansive list of coconspirators to preclude the defense from calling any of the 55 individuals as defense witnesses. For instance, if an individual was a potential coconspirator in danger of prosecution, he would likely assert his Fifth Amendment right to remain silent rather than testify at trial. (*Id.* p. 62–63). As a result, defense counsel argued that the Government had effectively blocked them from obtaining exculpatory testimony from all 55 individuals.[3] The Government would not

[3] According to defense counsel, this procedural block would bar them from calling all 55 individuals, regardless of how many of those individuals were ultimately implicated by

affirmatively say, at the hearing, whether it believed the statute of limitations had run for all coconspirators, thereby leaving open the possibility that these individuals could later be prosecuted. (*Id.* p. 67–68).

Having heard these arguments, and considering the difficulty of making individualized evidentiary determinations at trial about such a large number of potential (but not yet disclosed) coconspirator statements, the Court in June 2017 attempted to narrow the issues. (*See* Order, Doc. 446 at 67–68). The Court directed the Government to provide Defendants with its list of the specific coconspirator statements it would seek to introduce. (*Id.*).

On August 20, 2019, the Government provided Defendants with its list of approximately 83 statements, from 11 alleged coconspirators[4], that the Government would seek to introduce under Rule 801(d)(2)(E) via testimony from Ms. Cota and Mr. Lang. (Doc 485 at 30–98). After receiving this list, Defendants moved to exclude the approximately 83 alleged coconspirator statements. (Docs. 472, 473, 474). Defendants also repeated their objections to the Government maintaining that all 55 individuals remained unindicted coconspirators because,

---

the Government's Rule 801(d)(2)(E) statement list. And according to defense counsel, virtually all of these individuals testified before the grand jury that they did not believe there was anything improper about the contracts and that they did not willingly join into a criminal conspiracy. (*Id.* p. 62). As a result, defense counsel maintained that nearly all of these individuals would offer exculpatory testimony if they were to testify at trial. (*Id.* p. 63).

[4] The 11 alleged coconspirators included Ms. Cota and Mr. Lang, as well as nine other individuals.

in Defendants' view, the threat of future prosecution—however unlikely—led to exculpatory witnesses refusing to talk to or cooperate with the defense. (*Id.*).

As specific statements had now been identified, the Court held another hearing to address these unindicted coconspirator and Rule 801(d)(2)(E) disputes on October 3, 2019. (Hearing Tr., Doc. 477). At the hearing, defense counsel re-raised their concerns that the Government's strategy was blocking them from access to key defense witnesses with exculpatory testimony. In addition, defense counsel raised the question of why the Government never advised any of these individuals—at the time of their interviews or grand jury testimony—that they were subjects or targets rather than witnesses. (*Id.* p. 38). Ultimately, by the end of the hearing, and after much hedging, the Government agreed that the 55 alleged coconspirators were not subject to prosecution for past events because the statute of limitations had run. (*Id.* p. 55, 58). While the Government acknowledged that the statute of limitations had run, it never conceded that any of the 55 individuals were improperly named as coconspirators.

As to the approximately 83 out-of-court Rule 801(d)(2)(E) statements, defense counsel argued that the Government could not demonstrate their admissibility, in large part because the Government could not show the existence of a conspiracy to violate the AKS. In addition, defense counsel argued that allowing the introduction of such statements would permit the Government to present cherry-picked statements rather than a complete picture of any declarants'

testimony. (*Id.* p. 24). Defense counsel represented that the full scope of these declarants' grand jury testimony was exculpatory. (*See, e.g., id.* p. 79, 82).

Having heard these other arguments and considering the complexity of assessing so many statements, the Court directed the parties to present these issues in a more digestible way. In a February 11, 2020 Order, the Court explained that the parties' briefs regarding the admissibility of alleged coconspirator statements had been nonspecific and incomplete. (Doc. 497 at 2). Thus far, the Government had not presented sufficient evidence to support the admissibility of each statement, and the Court was required to evaluate each statement separately, and separately as to each Defendant. (*Id.* at 3–5). So the Court explained that it would hold a *James* hearing "on paper," i.e., via detailed and specific briefing. The Court therefore directed the Government to file a motion to admit the statements, supported by evidence and argument that would allow the Court to determine whether the Rule 801(d)(2)(E) statements were admissible. (*Id.* at 3, 9). The Court directed Defendants to respond with any argument and evidence to the contrary. (*Id.* at 10).

The parties then submitted briefing in accordance with the Court's instructions. (*See* Docs. 507, 520, 521, 526, 530). Those briefs were submitted to the Court on June 30, 2020. In its briefing, the Government argued that the standard it must meet in demonstrating the admissibility of the Rule 801(d)(2)(E) statements was the following:

> Rule 801(d)(2)(E) provides that a statement is not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." A co-conspirator statement is admissible where the United States establishes, by a preponderance of the evidence, that "(1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Sanchez*, 722 F.2d 1501, 1508 (11th Cir. 1984) (quoting *United States v. James*, 590 F.2d 575, 581 (5th Cir. 1979)).

(Gov. Motion to Admit, Doc. 507 at 3–4).

After a lengthy period of review—related to both the COVID-19 pandemic and the extensive number of statements raised in the Government's motion—the Court, on November 21, 2022, denied the Government's request to introduce the coconspirator statements under Rule 801(d)(2)(E). (Doc. 610). The Court found that the Government failed on the first element since it had not established that a conspiracy existed. (*Id.* at 38). In so denying, the Court applied the standard that both the Government and Defendants had argued applied. The Court then scheduled trial for April 2023. (Doc. 612).

But before any trial preparations could commence, the Government, on December 14, 2022, initiated an interlocutory appeal of the Court's non-dispositive evidentiary ruling on the Rule 801(d)(2)(E) issues. (Doc. 619). Defendants moved to expedite the appeal (and specifically cited speedy trial reasons). *See United States v. Holland*, Appeal No. 22-14219, Docs. 30, 35 (Apr. 17–18, 2023). That request was initially denied with leave to refile. *Id.*, Doc. 44 (May 5, 2023). Defendant Moore renewed the request to expedite in June 2023. *Id.*, Doc. 64 (June

7, 2023). That motion to expedite was granted, *id.*, Doc. 66 (June 20, 2023), and the case was set for oral argument on November 14, 2023. *Id.*, Docs. 70, 76 (July 24, 2023; September 7, 2023).

On November 2, 2023, less than two weeks before oral argument, the Eleventh Circuit issued a memo to the parties directing them to be prepared to address a new argument that neither party had raised. *Id.*, Doc. 80 (Nov. 2, 2023). The new argument involved whether, despite the text of Rule 801(d)(2)(E)[5], a statement could be admissible under Rule 801(d)(2)(E) if it was made in furtherance of *a lawful joint undertaking*, rather than a criminal conspiracy. *Id.*

The case was argued before the Eleventh Circuit on November 14, 2023. *Id.*, Doc. 84 (Nov. 14, 2023). Ten months later, on September 25, 2024, the Eleventh Circuit reversed and remanded this Court's decision, consistent with the theory it first raised in its November 2, 2023 memo to the parties. *See United States v. Holland*, 117 F.4th 1352 (11th Cir. 2024) (holding that the district court should have asked whether the out-of-court statements were made during and in furtherance of a joint venture with the Defendants). In its decision, the Eleventh Circuit acknowledged that the Government had not raised this argument before the district court. *Id.* at 1360–61. It held, however, that a court cannot apply an erroneous interpretation of a rule even if the parties did not identify the correct standard. *Id.*

---

[5] To refresh, Rule 801(d)(2)(E) says that a statement is not hearsay if the statement is offered against an opposing party and it "was made by the party's coconspirator during and in furtherance of the conspiracy."

Defendants Holland and Cota quickly petitioned for an expedited rehearing en banc. *See United States v. Holland*, Appeal No. 22-14219, Docs. 89, 91 (Oct. 8–9, 2024). The Eleventh Circuit denied that petition. *Id.*, Doc. 93 (Oct. 24, 2024).

### F.    Other Case Developments

After the case was remanded, the Court held a hearing with the parties on November 7, 2024 to address all outstanding issues and schedule trial. (Hearing Tr., Doc. 673). Based on counsel's many scheduling conflicts, the Court scheduled trial in this case for September 2, 2025. (Doc. 672). Defendants have since filed renewed speedy trial motions, asserting violations of both the Speedy Trial Act and their Sixth Amendment rights to speedy trials. (Docs. 675, 677, 679). The Government filed a consolidated response in opposition. (Doc. 687). Defendants replied. (Docs. 698, 699, 702).[6] The parties have also filed a number of supplemental briefs on speedy trial issues, some requested by the Court, others not. (*See* Docs. 706, 707, 714–721, 724). Among these supplemental filings is the Government's Motion for Leave to File a Supplemental Brief of three pages, (Doc. 706), and Defendant Moore's Motion for Leave to File a Surreply based on information disclosed by the Government on March 31, 2025, after the speedy trial briefing was completed. (Doc. 724). As the Court believes a comprehensive review of all relevant information is necessary, the Court **GRANTS** both motions. (Docs. 706, 724).

---

[6] Mr. Moore adopted the other Defendants' motions. (Docs. 682, 683). Mr. Cota adopted the other Defendants' motions. (Doc. 679).

The Government has also filed a new motion to admit coconspirator statements under Rule 801(d)(2)(E), consistent with the standard articulated by the Eleventh Circuit. (Doc. 684).

While this case has been pending, at least five defense witnesses have died or become unavailable. Bill Tinsley, the lawyer for Tracey Cota, who reviewed and provided legal advice about the Clinica contracts passed away unexpectedly in February 2024, while this case was on appeal. Three individuals (Dennis Phillips, Britt Reynolds, and Richard Fiske), who Mr. Holland intended to offer primarily as character witnesses, have died. A fifth witness, Thomas Crane, who Mr. Holland intended to call as an industry expert witness, has retired and become unavailable to testify as an expert in this case.[7] Beyond lost witnesses, Defendant Moore also contends that the Government has lost at least some likely exculpatory evidence over the years this case has been pending. The Court will address all of these issues in its analysis below.

The Court first addresses Defendants Speedy Trial Act arguments, and then their Sixth Amendment arguments.

## II.    Speedy Trial Act

### A.    Legal Standard

"To strengthen th[e] constitutional mandate" of a speedy trial provided by the Sixth Amendment, "Congress passed the Speedy Trial Act." *United States v.*

---

[7] Mr. Crane's qualifications are discussed *infra* at Section III.B.4 at 62–65. (*See also* Holland's Intended Draft Rule 16 Disclosure, Doc. 698-1).

*Ammar*, 842 F. 3d 1203, 1205, 1212-13 (11th Cir. 2016) ("Congress chose to safeguard this important right through the *rigid* procedural requirements of the Speedy Trial Act.") (emphasis added). The Speedy Trial Act provides "that the trial of any defendant who pleads not guilty must begin within 70 days of either the filing of the indictment or the date the defendant first appears before a judicial officer to answer the charges, whichever occurs later." *Id.* at 1205 (citing 18 U.S.C. § 3161(c)(1)). This 70-day time period "may be tolled for certain statutorily enumerated reasons." *Id.* Relevant here, time may be tolled where a judge grants a continuance "on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7). However, in order for time to be excludable under this provision, the court must set forth in the record its reasons for finding that the ends of justice served outweigh the best interest of the public and the defendant in a speedy trial. *Id.*  If a defendant is not tried within the 70-day window, accounting for all excludable periods, "then the district court must grant the defendant's motion to dismiss the indictment." *Id.* (citing § 3161(a)(2)).

### B.    Whether the Speedy Trial Act Clock Has Run

The Court addressed this issue once already. In its prior Order, the Court explained that whether the Speedy Trial Act clock has run depends on whether the Southern District of Florida's March 28, 2017, Order ("the Florida Order," Doc. 41) remains in effect. That Florida Order provided an open-ended exclusion of time under the Speedy Trial Act. If the Florida Order remains in effect, the Speedy Trial

Act clock has not run.  If it does not remain in effect, the Speedy Trial Act deadline has long since expired.

In the Florida Order, the Florida district judge designated the case as complex, reset the original trial date of April 3, 2017 to July 10, 2017, excluded time under the Speedy Trial Act, and provided an "ends of justice" rationale for that exclusion of time, as shown below:

> [T]he Court finds that . . . the ends of justice will be served by a continuance of the trial as to the Defendant as set forth below, and that an extension outweighs the interest of the public and the defendant in a speedy trial . . . .
>
> The Court finds that the period of delay from **March 23, 2017 to July 10, 2017**, and any other trial date set hereafter excludable in calculating the period within which trial must commence in accordance with the provisions of the Speedy Trial Act, 18 U.S.C. 3161(h)(7)(A).

(Doc. 41) (emphasis in original). The Florida Order applied only to Mr. Holland, as he was the only Defendant charged at that time.

When this Court first addressed this issue (in evaluating Defendants' 2022 speedy trial motions), it determined that the March 2017 Florida Order was still in effect and so the speedy trial clock was still tolled. (Doc. 617-1 at 12–16). In their renewed speedy trial motions, Defendants ask the Court to revisit this issue. (*See* Docs. 675, 679, 682). The Court has therefore conducted a fresh review of the procedural history of this case and the governing legal authority—all with the aid of additional, and more thorough, briefing by the parties.

The Court's prior determination that the Florida Order remained in effect was based primarily on the fact that the Florida court order was never *expressly* vacated. (Doc. 617-1 at 12–16). The Court explained that open-ended "ends of justice" extensions, like the one in the Florida Order, are generally permissible. The Court also reasoned that, when an order is issued, the Government and Defendants should be able to rely on that order until it is expressly vacated by the Court. The Court also rejected Defendants' contention that the Second Superseding Indictment (which added Defendants Moore and Cota) impacted or voided the Florida Order.

The Court's prior Order was erroneous—and the Court must now correct that error. Upon a fuller, more detailed review, the Court concludes that the Florida Order did not remain in effect after Mr. Holland's case was transferred to this district and after the Second Superseding Indictment (adding new Defendants) was issued.

To start, a review of the record shows that *no one*—not Magistrate Judge Salinas, not this Court, not the Government, and not Defendants—believed that the Florida Order's "ends of justice" finding and speedy trial exclusion were still in effect once the case was transferred to this district.

During the August 1, 2017, teleconference held by Judge Salinas shortly after Mr. Holland's case was transferred, the issue of the speedy trial clock arose. On the call, counsel for the Government asked Judge Salinas to hold off on ruling on the then-pending motions because the Government was considering issuing a second

18

superseding indictment. (8/1/17 Hearing Tr., Doc. 600 p. 3–8). Judge Salinas asked if delaying adjudication of the pending motions would present any problems with respect to the speedy trial clock. (*Id*. p. 8). Counsel for both sides discussed that the case had been designated "complex" in both the Southern District of Florida and in the Northern District of Georgia. (*Id*. p. 9). That said, all counsel *agreed* that simply declaring a case complex does not (1) remove the protections of the Speedy Trial Act or (2) toll time under the Speedy Trial Act. (*Id*.). After this discussion and at the request of Judge Salinas, the Government agreed to prepare an order excluding the relevant time under the Speedy Trial Act while Judge Salinas held off ruling on the pending motions. (*Id*. p. 10). During this conversation, *no one* mentioned the Florida Order at all, let alone suggested that the speedy trial clock was tolled because of the Florida Order. Instead, all counsel and Judge Salinas believed that, broadly speaking, the speedy trial clock was ticking.[8]

This shared belief that the speedy trial clock was running is also reflected in *numerous* subsequent orders excluding time under the Speedy Trial Act or referencing the need to exclude time:

- On August 2, 2017 (the day after the above-described teleconference), Judge Salinas issued a new scheduling order (Doc. 104) explaining that, if any party sought a continuance of the August 10, 2017 pretrial conference, that party must submit a

---

[8] During the teleconference, counsel for Mr. Holland explained that the clock was likely tolled *while the motions remained pending*; however, all counsel agreed that it was more prudent for Judge Salinas to issue an order explicitly excluding the time anyway.

proposed order that *included language excluding time under the Speedy Trial Act.*

- On August 10, 2017, Judge Salinas issued an Order excluding time under the Speedy Trial Act. (Doc. 108) ("Accordingly, it is HEREBY ORDERED that the delay between the second pre-trial conference call on August 1, 2017 through September 29, 2017, by which time the Government will decide whether it will bring additional charges in this matter, shall be excluded from the Speedy Trial Act calculations. 18 U.S.C. § 3161, *et seq.*").

- On October 19, 2017, Judge Salinas allowed the parties an extension of time to file additional motions until 1/19/18 and ruled that "[t]he delay occasioned by this extension shall be considered a period of excludable delay pursuant to 18 U.S.C.§3161(h)(7)(A) because the court found it needed to allow reasonable time for preparation and also found that the ends of justice served thereby outweigh the interests of the public and the defendant in a speedy trial." (Doc. 147).

- On June 1, 2018, Judge Salinas excluded time from 6/1/18 to 6/15/18 under the Speedy Trial Act (Doc. 306).

- On August 10, 2018, this Court explained that "[t]he time between August 10, 2018, and August 31, 2018, shall be excluded from computation under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(7)(A), (B)(i) and (B)(iv)." (Doc. 351).

- On September 22, 2022, this Court held that "[t]he time to January 25, 2023, shall be excluded from computation under the Speedy Trial Act." (Doc. 571).[9]

---

[9] In addition, on numerous occasions, time was excluded under the Speedy Trial Act pursuant to General Orders issued by the Chief Judge in connection with the COVID-19 pandemic (Docs. 503, 515, 517, 531, 533, 534, 536, 542, 545, 548, 563).

These orders excluding time for Speedy Trial Act purposes show that all counsel, Judge Salinas, and this Court believed that the speedy trial clock was running. Moreover, the fact that *no one* mentioned the Florida Order—for the many years this case was litigated—shows that no one believed it to be in effect. In its prior speedy trial Order, the Court reasoned that "the Government and defendants should be able to rely" on a court order until it is vacated or withdrawn, and that this reliance was reason to find that the Florida Order remained in effect. While that sentiment is true *in theory*, the reality here is that no one relied on the Florida Order after Mr. Holland's case was transferred to this district. And so the Court was incorrect to cite that reliance interest as a basis for its prior finding. Instead, any reliance interest here weighs in favor of a finding that the Florida Order *did not survive* transfer to this district or the Second Superseding Indictment—because no one believed that it had.

The parties and the Court's beliefs that the Florida Order's "ends of justice" finding and speedy trial exclusion were no longer in effect were reasonable and consistent with the relevant legal authority.

Generally, a new scheduling order supersedes a prior scheduling order. *See, e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 2006 WL 3000145, at *1 (S.D. Ala. Oct. 20, 2006) (holding that a new scheduling order superseded the old scheduling order and that the deadline for joinder in the old scheduling order was no longer effective where the new scheduling order did not include such deadline). And a transferee court is not necessarily bound by a scheduling order issued by a

transferring court. *See, e.g., Archer v. Mead Corp.*, 998 F. Supp. 2d 1262, 1282 (N.D. Ala. 2014) (finding that the prior scheduling and case management order issued by the Eastern District of Pennsylvania was no longer effective, especially where the nature and context of the case had dramatically shifted since the transfer).   Here, Judge Salinas issued a new scheduling order on August 2, 2017. (Doc. 104). This scheduling order included no "ends of justice" finding or open-ended Speedy Trial Act exclusion. Rather, this scheduling order implicitly recognized that the speedy trial clock was ticking because it directed the parties to, when seeking extensions, provide proposed orders that included language excluding Speedy Trial Act time for the period of the extension. (*Id.*).

In addition, the parties and the Court were correct to believe that the Florida Order's speedy trial exclusion was no longer in effect after the issuance of the Second Superseding Indictment. After the case was transferred to this district, the Government issued a Second Superseding Indictment *that added two new Defendants* and transformed the nature of this criminal action. Where a superseding indictment adds new defendants, the speedy trial clock *starts anew* as to all defendants as of the arraignment of the last defendant. *Henderson v. United States*, 476 U.S. 321, 331 & n.2 (1986) (explaining that where a superseding indictment added new charges *and new defendants*, the speedy trial clock commenced anew upon the arraignment of the last codefendant).[10]

---

[10] *See also United States v. Barnes*, 251 F.3d 251 (1st Cir. 2001) (holding that the filing of a superseding indictment adding new defendants restarts the speedy trial clock for all

Applying this binding authority, the speedy trial clock reset (with respect to Mr. Holland) or started for the first time (with respect to Mr. Moore and Mr. Cota) on October 3, 2017.[11] Shortly after Mr. Moore and Mr. Cota were arraigned, Judge Salinas entered a new scheduling order on October 11, 2017. (Doc. 136). Like her prior scheduling order, the October 11, 2017 scheduling order recognized that the speedy trial clock was ticking because it required parties seeking extensions to file proposed orders that included "appropriate language excluding any delay under the Speedy Trial Act." (*Id.* at 12). If the speedy trial clock were tolled, there would have been no reason for Judge Salinas to include this language. Considering that the speedy trial clock started anew on October 3, 2017—after the case was transferred to this district and after two new Defendants had been added—there is

---

defendants); *United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) ("[T]he speedy trial clock in cases involving multiple defendants begins with the running of the clock for the most recently added defendant"); *United States v. Dixon*, 542 F. App'x 273, 278 (4th Cir. 2013) (finding that the a superseding indictment that added defendants and included an additional charge against the defendant for conspiracy restarted the STA clock); *United States v. Franklin*, 148 F.3d 451, 455 (5th Cir. 1998) ("[T]he speedy trial clock does not begin to run in a multi-defendant prosecution until the last codefendant makes his initial appearance in court"); *United States v. Farmer*, 543 F.3d 363, 368 (7th Cir. 2008) ("When more than one defendant is charged in an indictment, the Speedy Trial clock begins to run on the date of the last co-defendant's initial appearance, which is usually arraignment."); *United States v. Patterson*, 140 F.3d 767, 772 (8th Cir. 1998) ("Where multiple defendants are joined for trial and no motion for severance has been granted, the statutory time period does not begin to run until the last codefendant has been indicted or arraigned, *see Henderson . . ..*"); *United States v. King*, 483 F.3d 969, 973 (9th Cir. 2007) (holding that the filing of a superseding indictment that added a new defendant restarts the STA clock for all defendants); *United States v. Van Smith*, 530 F.3d 967, 972 (D.C. Cir. 2008) (holding that a superseding indictment that added new a codefendant reset original defendant's 70-day speedy trial clock, even though superseding indictment did not change the charges against original defendant).

[11] Mr. Moore and Mr. Cota were arraigned on October 3, 2017. (Docs. 130, 133).

no legal or practical basis to find that the Florida Order's "ends of justice" finding and speedy trial exclusion were still in effect.

In its prior Order, the Court erroneously rejected Defendants' argument that the Second Superseding Indictment reset the speedy trial clock. The Court relied on legal authority holding that a superseding indictment does not necessarily restart the speedy trial clock. But none of the cases the Court cited involved a superseding indictment *that added new defendants*. And it is well-settled under binding Supreme Court authority that a superseding indictment *that adds new defendants* restarts the speedy trial clock. *See supra* at 22–23, n.10. In overlooking this important distinction in the caselaw between the impact of a superseding indictment that merely adds new charges and one that adds new defendants, the Court erred.

In addition, the Court relied on the principle that "[a]nything which 'stops the clock' for one defendant does so for the same amount of time as to all co-defendants." *United States v. Pirolli*, 742 F.2d 1382, 1384 (11th Cir. 1984). In citing this principle, the Court determined that Defendants Moore and Cota were bound by the Florida Order because that Florida Order stopped the clock for Mr. Holland. While this principle is generally correct, it does not apply here. The clock did not stop for Mr. Holland and then relatedly stop for Mr. Moore and Mr. Cota. The clock did not *stop* for Mr. Moore and Mr. Cota at all. According to the Government's theory, the Florida Order prevented Mr. Moore and Mr. Cota's Speedy Trial Act clock *from ever starting* in the first place. But this reasoning would deprive Mr.

24

Moore and Mr. Cota of their Speedy Trial Act protections entirely. Such a finding is not consistent with the strict protections provided by the Speedy Trial Act.

Finally, the Florida Order, including its "ends of justice" finding and speedy trial exclusion, must be viewed in context. The case against Mr. Holland was originally placed on the Southern District of Florida's "rocket docket." The indictment was filed on January 24, 2017. (Doc. 1). Mr. Holland was arraigned on February 1, 2017. (Doc. 10). Trial in this complex white-collar case was then set to begin a mere *two months later*, on April 3, 2017. (Doc. 12). In the face of this warp speed schedule, Mr. Holland moved to continue the trial date so that his counsel could prepare. (Doc. 27). The Florida Order granted Mr. Holland's request to move the trial by three months, from April 3 to July 10, 2017. In so granting, the Florida court found that the ends of justice would be served by "a continuance of the trial as to the Defendant *as set forth below*." (Doc. 41) (emphasis added). Then, below, the Florida court excluded "the period of delay from **March 23, 2017 to July 10, 2017**, and any other trial date set hereafter" under the Speedy Trial Act. (*Id.*) (emphasis in original).

The Florida court tethered the "ends of justice" finding to the *particular* trial continuance set forth below—specifically to July 10, 2017. Based on the textual clues, the Florida court issued the Order with the intent to exclude a specific brief time period before a soon-to-be-held trial, and further included a caveat to cover additional time if the trial were then pushed some days or months later by that court. Nothing in the Florida Order supports the inference that the Florida court

25

intended for the "ends of justice" finding or the Speedy Trial Act time exclusion to extend *for years* into the future, let alone to extend beyond a district transfer and the addition of new Defendants and charges. Rather, the "ends of justice" finding and the open-ended exclusion were tied to resetting of the trial date *to July 10, 2017*. After the case was transferred, the basis for the open-ended exclusion (the continuance of trial until July) expired, and so too did the "ends of justice" finding and open-ended exclusion.

To authorize a years-long, open-ended Speedy Trial Act exclusion under the circumstances here runs counter to guidance from the Supreme Court and other courts of appeals. In *Zedner v. United States*, the Supreme Court addressed a situation in which a district court failed to include an "ends of justice" finding on the record in support of an open-ended exclusion. 547 U.S. 489 (2006). The *Zedner* Court ultimately concluded that, under the strict procedures of the Speedy Trial Act, the district court's failure to include an "ends of justice" finding that explained the open-ended exclusion was not harmless error and that the Government violated the defendant's rights under the Speedy Trial Act. *Id*. at 509. In so holding, the *Zedner* Court discussed the potential "danger" of open-ended exclusions:

> The exclusion of delay resulting from an ends-of-justice continuance is the most open-ended type of exclusion recognized under the Act and, in allowing district courts to grant such continuances, Congress clearly meant to give district judges a measure of flexibility in accommodating unusual, complex, and difficult cases. *But it is equally clear that Congress, knowing that the many sound grounds for granting ends-of-justice continuances could not be rigidly*

> *structured, saw a danger that such continuances could get out of*
> *hand and subvert the Act's detailed scheme.* The strategy of [the Act],
> then, is to counteract substantive openness with procedural strictness.

*Id.* at 508–09 (emphasis added).

Consistent with this understanding that open-ended exclusions can "get out of hand and subvert the Act's detailed scheme," numerous circuit courts have cautioned that open-ended continuances that are too lengthy are not permissible. *See, e.g., United States v. Lattany*, 982 F.2d 866, 868 (3d Cir. 1992) (finding that one-year delay was not unreasonable but holding "that open-ended continuances to serve the ends of justice are not prohibited *if they are reasonable in length*" and that "open-ended continuances cannot . . . be unreasonably long") (emphasis added); *United States v. Santiago-Becerril*, 130 F.3d 11, 18 (1st Cir. 1997) (holding that open-ended continuances must be reasonable in length but finding that 219-day delay was "not unreasonable or excessively long"); *United States v. Spring*, 80 F.3d 1450, 1458 (10th Cir. 1996) (finding that open-ended continuance was reasonable in length under circumstances involving a change of counsel but stating, "while it is preferable to set a specific ending date for a continuance, there will be rare cases where that is not possible, and an open-ended continuance for a *reasonable* time period is permissible.") (emphasis added); *United States v. Westbrook*, 119 F.3d 1176, 1188 (5th Cir. 1997) (holding that "it was perfectly reasonable for the district court to grant an open-ended continuance that extended until the first available trial date after the transcripts were ready . . . which lasted about five months."). While none of these courts found that the delay in those cases

was overly lengthy, they instruct that an *unreasonably long* open-ended exclusion is not permissible. The above authority therefore counsels that this Court should not green light an unreasonably lengthy open-ended Speedy Trial Act exclusion. Accordingly, this legal authority weighs against a finding that the Florida Order remains in effect—because such a finding would authorize an unreasonably lengthy open-ended exclusion of approximately eight years.[12]

In its prior Order, the Court explained that Defendants could or should have moved to terminate the Florida Order. (Doc. 617-1 at 15). Yet considering that no one—not the Magistrate Judge, not the Court, not the Government, and not defense counsel—believed that the Florida Order remained operative, laying the blame at Defendants' feet is not reasonable or just. Rather, it is the Government's obligation to bring Defendants to trial, and to do so in a manner that complies with the Speedy Trial Act and constitutional protections. *United States v. Brown*, 2021 WL 3277233, at *2 (M.D. Ga. July 30, 2021) ("Speedy trial management rests entirely with the Government."). Had the Government wanted to ensure that an "ends of justice" finding and open-ended speedy trial exclusion were in effect, it should have requested as much, or even *raised the issue* of the Florida Order. But it never did.

In sum, the Court concludes that the Florida Order's "ends of justice" finding and open-ended Speedy Trial Act exclusion were tethered to the extension of Mr.

---

[12] Moreover, during that time, no court has evaluated the original reason given for the open-ended exclusion.

Holland's trial date *to July 10, 2017* in the Southern District of Florida. This Florida Order was extinguished upon the transfer of Mr. Holland's case to this district, the entry of multiple new scheduling orders, and the issuance of the Second Superseding Indictment that added Defendants Moore and Cota. Having found that the Florida Order's "ends of justice" finding and open-ended Speedy Trial Act exclusion were no longer effective after these events, it is undisputed that far more than 70 non-excludable days have passed since the last Defendants' arraignments (on October 3, 2017). As a result, the Speedy Trial Act has been violated, and the Court must dismiss the Second Superseding Indictment. *See* 18 U.S.C. § 3161(a)(2).

### C. Whether the Claims Should Be Dismissed With or Without Prejudice

When a court determines that dismissal is required under the Speedy Trial Act, it must assess whether the circumstances of the case warrant dismissal with or without prejudice. *United States v. Jones*, 601 F.3d 1247, 1257 (11th Cir. 2010). To guide courts in this assessment, the Speedy Trial Act sets out certain factors for consideration: (1) the seriousness of the offense; (2) the facts and circumstances of the case which led to the dismissal; and (3) the impact of a reprosecution on the administration of the Act and on the administration of justice. *Id.* (citing 18 U.S.C. § 3162(a)(2)).

Reviewing courts must conduct a step-by-step balancing of these considerations, and dismissal with prejudice may be appropriate even where one or more factor weighs against such an outcome. *United States v. Russo*, 741 F.2d 1264, 1266–68 (11th Cir. 1984) (dismissing indictment with prejudice even after

finding that the alleged offense was serious). In this Circuit, there is no preference for dismissal with or without prejudice. *Id.* at 1266–67. Rather, "the proper dismissal sanction to be imposed in each case is a matter left to the exercise of the sound discretion of the trial judge after consideration of the factors enumerated in the statute." *Id.* at 1267.

Applying the above framework, the Court first assesses the seriousness of the offense. This is an AKS case in which Defendants are charged with conspiracy, payment of bribes, wire fraud, mail fraud, and falsification of books. (Second Superseding Indictment, Doc. 121). Generally speaking, the Second Superseding Indictment alleges that Mr. Holland and Mr. Moore, as Tenet executives, conspired to pay Mr. Cota's organization (Clinica) in exchange for Clinica referring patients to Tenet hospitals. While these alleged financial crimes are not insignificant, there are no allegations that the Defendants personally received any monetary benefit.[13] There are also no allegations that the patients did not actually receive services for which Tenet was paid, or that government payors overpaid for services rendered. And there is no colorable evidence that the contracts caused doctors to provide inadequate patient care.[14] In short, the charged offenses are relatively serious, but

---

[13] The Government briefly argues that Defendants likely received more compensation because of the contracts. The Government points to no evidence that supports this contention. Defense counsel argues that Mr. Holland's and Mr. Moore's compensation was driven by Tenet's stock prices, and that the contracts had no effect on the stock price.

[14] The Government previously alleged and argued that Clinica patients were harmed because they had worse outcomes and experienced "irregularities" in their care. The Court has already evaluated these allegations and determined that the Government provided no

that level of seriousness is tempered by the lack of any allegations that Defendants personally profited, that medical services were upcharged, or that professional medical services were not provided.

In evaluating this first factor, the Eleventh Circuit has also explained that "[w]here the crime charged is serious, the court should dismiss [with prejudice] only for a correspondingly severe delay." *Russo*, 741 F.2d at 1267 ("We express no opinion as to whether a delay of more than seventy days alone would warrant dismissal with prejudice. However, such an extensive postponement certainly militates toward that result."). Here, the delay has been severe. Defendants were indicted in September 2017. The relative seriousness of the offenses must be balanced against the extreme delay involved in this case. In light of the extreme delay as compared to the moderate seriousness of the alleged crimes, the first factor supports dismissal with prejudice.

The Court next assesses the facts and circumstances that led to the dismissal. Under the second factor, courts focus on "the culpability of the delay-producing conduct." *United States v. Williams*, 314 F.3d 552, 559 (11th Cir. 2002) (citing *United States v. Hastings*, 847 F.2d 920, 925 (1st Cir. 1988)). The Eleventh Circuit has held that "in order to prevent abuse of the Speedy Trial Act's deadlines, we

---

evidence (1) that Clinica patients suffered statistically significant worse outcomes than other patients or (2) that Clinica patients received care that was different or disparate than the care received by other non-Clinica patients delivering at the same hospitals. (*See* Doc. 446 at 60–66). Moreover, the Government's conclusory allegations of patient harm were not relevant to the charges. (*Id.*). Instead, the Government's insistence on including these allegations only caused additional delay in this long-litigated case.

require a showing of 'some affirmative justification' by the government to warrant a dismissal without prejudice." *United States v. Godoy*, 821 F.2d 1498, 1505 (11th Cir. 1987) (citing *Russo*, 741 F.2d at 1266)). "[T]he mere lack of improper motive is not a sufficient excuse for delay. Some affirmative justification must be demonstrated to warrant a dismissal without prejudice." *Russo*, 741 F.2d at 1267.

Here, the delay-producing conduct is myriad: the Government's unexplainable initial filing of this case in Florida (despite investigations and related proceedings occurring in Atlanta), the extensive motions practice on all sides, the Government's strategies of naming 55 unindicted coconspirators and seeking to introduce alleged coconspirator statements through Ms. Cota and Mr. Lang rather than by calling the declarants as witnesses, the disruptive impact of the COVID-19 pandemic, Court delay, and the Government's interlocutory appeal of a non-dispositive evidentiary ruling.

Having comprehensively considered the reasons for delay, and recognizing that both sides somewhat contributed to the delay, the Court ultimately concludes that the Government is slightly more responsible for the delay in this case. *See infra* at Section III.B.2 (discussing the causes of delay in significantly more detail). Ultimately, the Government has not shown some "affirmative justification" for the delay as to warrant dismissal without prejudice. *Russo*, 741 F.2d at 1267.

To start, while it occurred many years ago, the Government's initial decision to bring this case in Florida smells of forum-shopping. The relevant conduct took place largely in Atlanta. The Government investigated this case in Atlanta. A grand

32

jury had been sitting in Atlanta, hearing evidence since 2014. Defendants' counsel met with Government representatives in Atlanta. Other defendants entered guilty pleas in Atlanta. Despite these facts, the Government chose to indict Mr. Holland in Florida—a decision that caused more than six months of delay. The Government has still provided no reasonable justification for this decision.

In addition to this initial delay, the primary reason for delay in this case involves (1) the Government's litigation strategy of naming 55 coconspirators and seeking to introduce nearly 83 alleged coconspirator statements under Rule 801(d)(2)(E) rather than by calling the declarants and (2) the Court's and the Eleventh Circuit's review of these issues over a lengthy period of time. As discussed in far more detail in Section III.B.2, the Government's pursuit of this highly irregular strategy caused years-long delay.

After the Court ruled against the Government on this issue, the Government could have subpoenaed the nine remaining declarants to testify at trial. This would have shown that the Government was seeking to bring the case to trial with haste. After all, at the time the Court ruled against the Government on the coconspirator issue (Doc. 596), Defendants had already filed compelling speedy trial motions raising serious concerns about the Government's delay in bringing this case to trial (Docs. 579, 582, 585). The Government was thus on notice that of the risk that it was or soon would be violating Defendants' rights under the Speedy Trial Act and the Sixth Amendment. Yet instead of proceeding to trial—and preparing to call a reasonable number of unindicted alleged coconspirator witnesses to testify—the

Government appealed a non-dispositive evidentiary matter, for which there was an alternative route for the presentation of the disputed evidence.[15] While the Government had every right to appeal, and obtained a reversal (based on an argument raised for the first time by the Eleventh Circuit), this decision to appeal was at odds with a desire to bring this case to trial with haste. Even now, the coconspirator hearsay issue is not settled, as the Government's strategy requires further Court evaluation and adjudication.

Ultimately, considering the Florida foray and the Government's years-long strategy for introducing alleged coconspirator statements, the Government has not shown an affirmative justification for the violation of the Speedy Trial Act. The second factor supports dismissal with prejudice.

The third factor is the impact of reprosecution on the administration of the Act and on the administration of justice. In applying the third factor, courts have recognized that "[t]here is some tension between the administration of the Act and the administration of justice." *Godoy*, 821 F.2d at 1506. Specifically, "Defendants can always argue that the minimal sanction of dismissal without prejudice takes the teeth out of the Act's requirements." *Id.* On the other hand, the Government "can always argue that reprosecution furthers the public's interest in bringing criminals to trial." *Id.* Thus, while these concerns sometimes "neutralize each other," this third factor is not *always* neutral. *Id.* In part, this factor emphasizes

---

[15] As explained *infra* at Section III.B.2, the Government could have called the nine remaining declarants as witnesses at trial, introduced the statements via the other rules it argued applied, or a mix of both strategies.

the balancing approach required under the statute because "[i]f a violation of the Act is quite egregious, reprosecution will have more of a negative effect on the administration of the Act. Similarly, if a crime is quite serious, barring reprosecution will have a severe impact on the administration of justice." *Id*. Beyond this emphasis on balancing, the third factor "provides authority for considering such aggravating and mitigating factors as the length of the delay and the prejudice to the defendant." *Id*. "In short, this third factor permits each side to submit any relevant consideration not covered by the other two statutory factors." *Id*.

Here, the length of delay in bringing Defendants to trial is egregious. As Defendants' repeat: the events at issue took place between 12 and 25 years ago, the investigation before the indictments lasted years, and Defendants were indicted about eight years ago. Certainly, reprosecution would have a negative effect on the administration of the Speedy Trial Act.

In assessing this third factor, the Court must also consider the prejudice to the Defendants in presenting their defense. Here, there are serious concerns related to deceased and unavailable witnesses, as explained *infra* at Section III.B.4. In particular, the death of Mr. Tinsley in 2024 has deprived Defendants of fully presenting their advice of counsel affirmative defense and a complete picture of the evidence that they argue will negate the willfulness requirement of the charged conduct. And even if Defendants could introduce some of Mr. Tinsley's writings, it would be through Ms. Cota—a cooperating Government witness, with an incentive

to testify favorably for the Government. Any such evidence would be received differently by a jury than if presented through an attorney serving as a defense witness. In addition, Mr. Holland has lost a chosen expert witness—Thomas Crane—with significant expertise in the industry. *See infra* at Section III.B.4 at 62 – 65. Mr. Holland has also lost three important character witnesses. In a case that might come down to criminal intent, character witnesses may be more relevant than in other cases.

In addition to lost witnesses, there is the issue of some pieces of lost evidence. In a motion filed on April 7, 2025, Mr. Moore argued that the lengthy prosecution of this case had resulted in the loss of nine sets of FBI notes from interviews with Tracey Cota. (Moore Mot., Doc. 724-1 at 2).[16] Mr. Moore specifically requested the missing sets of notes from the Government in December 2024 based on his belief that the missing notes contained exculpatory information. This was so, according to Mr. Moore, because the interview notes that the Government *had already* produced contained exculpatory information, as those notes differed in material ways from the FBI 302 reports of the corresponding interviews.[17] Based on the evidence of information added to or omitted from the

---

[16] Tracey Cota met with the Government approximately 18 times, and the Government previously only produced notes from some of those meetings.

[17] For example, the Government produced notes show that FBI agents both added and omitted material information when drafting the FBI 302 reports. For instance, the FBI 302 reports for October 17 and 18, 2013 say that Ms. Cota "received a telephone call from the CEO of AMB. She thought it was [Bruce] Buchanan but it made more sense (based on the date/timing of the call) that it was Moore who was the CEO at the time and he was the

302 reports, it was a reasonable inference that the lost notes contained at least some exculpatory information. At the time of Mr. Moore's filing, the Government had not produced the missing notes, despite Mr. Moore's repeated requests. When Mr. Moore inquired a final time on March 31, 2025, the Government responded that there was no explanation for the missing notes "[o]ther than we don't have them." (Gov. Email Response, Doc. 724-4).

Despite this assertion that the Government did not have them, on April 18—the date the Government's response to Mr. Moore's filing was due—the Government found and produced seven sets of missing notes from the Government's interviews with Tracey Cota. (Doc. 728). While this production certainly addressed many of Mr. Moore's concerns, the Government has still failed to produce notes from Tracey Cota's first pre-proffer interview with the Government on October 12, 2012. As the other interview notes contained some exculpatory information (*see* n.17), it is reasonable to believe that the notes from the October 12, 2012 interview might also contain exculpatory information. Even though there is now only one set of missing notes, these notes may be particularly

---

one who called her." (Doc. 724-6 at ECF 19). The same 302 report also says that Ms. Cota and "Ed Cota, Holland, and either Moore or Buchanan" met at Houston's restaurant. (*Id.*). However, the actual notes from these interviews do not mention Mr. Moore at all. (*Id.* at ECF 38–103). And Mr. Moore was not the CEO at the time Ms. Cota said she received the telephone call. As another example, an FBI 302 report from an April 25, 2014 interview with Ms. Cota says that she "felt that if [the arrangement between Clinica and Tenet] was not legal, then the attorneys would tell them . . . but [Ms. Cota] advised that she now sees it differently." (Doc. 724-7 at ECF 3). But this 302 report omits material information contained in the agents' notes stating that "During the negotiations, [Ms. Cota] was not thinking that this whole thing was about paying for referrals." (*Id.* at ECF 16).

important for two reasons. First, the Government interviewed Ms. Cota approximately 18 times and she appears to have changed her story over the course of those interviews. Understanding the full context of that shift begins with the first meeting, and one that occurred before Ms. Cota was given the opportunity to provide a proffer. Second, based on the Government's representations, Ms. Cota appears to be possibly the most important witness to the Government's case, and so any notes regarding her prior statements that might contain inconsistencies or exculpatory information are relevant. The loss of this set of notes therefore adds some minimal weight to the prejudice Defendants have suffered in the form of lost witnesses.

Beyond direct prejudice, the careless manner in which the Government has handled the production of these interview notes is symptomatic of the problems that arise when prosecution of a complex criminal case has taken this long. When a case is transferred from prosecutor to prosecutor over the course of eight years, things slip through the cracks or get lost in files. These key interview notes—which, in the Court's view contain *Brady* information—were nearly forever lost. Without defense counsel's zealous representation, they likely would never have been produced. As discussed below, excessive delay "compromises the reliability of a trial in ways that neither party can prove, or, for that matter, identify." *Doggett*, 505 U.S. at 655. At this juncture, the Court cannot be completely sure that other evidence has not similarly slipped through the cracks.

In addition to lost witnesses and a set of lost notes, the memories of existing witnesses have no doubt been impacted since the relevant events occurred between 12 and 25 years ago. Courts "generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or, for that matter, identify." *Doggett*, 505 U.S. at 655. Yet here, the ways in which the lengthy delay has eroded the evidence are specific and clear—lost witnesses, a lost set of notes, and faded memories. Accordingly, the delay has necessarily impaired Defendants' ability to present their defense. Prejudice to the Defendants' case thus weighs in favor of dismissal with prejudice.

In addition to prejudice to their cases, Defendants have experienced personal distress resulting from the delay. Defendants have lost their livelihoods and ways of making income. Defendants have had the cloud and anxiety of indictment hanging over them for eight years and have dealt with financial impairment associated with presenting a robust defense. *Moore v. Arizona*, 414 U.S. 25, 26–27 (1973) (noting that "inordinate delay" may "disrupt [a defendant's] employment, drain his financial resources, curtail his associations, subject him to public obloquy and create anxiety in him, his family and his friends") (internal citations omitted). Although any defendant subjected to criminal prosecution will experience such anxiety, the stress and related uncertainty experienced by Defendants is no doubt intensified by the lengthy period of time they have spent awaiting trial. *See Burkett v. Fulcomer*, 951 F.2d 1431, 1445 (3d Cir. 1991) (explaining that the defendant suffered prejudice in the "anxiety of not knowing"

what would happen in the appeal of his case, noting "[i]t is not, however, a qualitative difference but the increased *quantity* of prejudice which concerns us" in light of the lengthy delay) (emphasis in original). In addition, at least one Defendant, Mr. Moore, has suffered from a serious health condition during the time he has been under indictment. (*See* Doc. 730). And Mr. Moore, who is 69 years old, and Mr. Holland, who is 68, are not young men.

To be sure, there is a public interest in seeing that participants in an alleged AKS scheme are held responsible for their actions. But this interest is moderated by the circumstances here: Defendants made no money personally from this alleged scheme; there are no allegations that the services paid for were not provided or that government payors were overcharged for the services; there are no colorable or admissible allegations of patient harm (*see supra* n.14); and Tenet has already paid a significant multi-million dollar civil settlement to the Government.[18] The public interest in holding Defendants responsible is tempered by these facts. And the public interest is also somewhat undercut by the Government's delay in bringing this case to trial.

In sum, on balance, while the crimes at issue are relatively serious, the public interest here is not strong enough to overcome the extreme delay in bringing this case to trial and the prejudice to Defendants' capacity to receive a fair trial now.

---

[18] *See DOJ Press Release*: https://www.justice.gov/archives/opa/pr/hospital-chain-will-pay-over-513-million-defrauding-united-states-and-making-illegal-payments#:~:text=In%20the%20civil%20settlement%2C%20Tenet,Health%20Mgmt (Oct. 3, 2016).

Instead, the impact of reprosecution of this case would undermine the Speedy Trial Act, the Defendants' ability to present a robust defense, and principles of fairness and accountability in the criminal justice system itself. Having assessed the three factors, the Court finds that it must dismiss the case with prejudice as to all Defendants.

### III.    Constitutional Right to a Speedy Trial

While the Government's Speedy Trial Act violation provides its own basis for dismissal with prejudice, the Court also addresses Defendants' *alternative* argument for dismissal under the Sixth Amendment.

#### A.    Legal Standard

The Sixth Amendment of the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. Because of the "unique policies" underlying the constitutional speedy trial right, if a Court finds that the right is violated it must "set aside any judgment or conviction, vacate any sentence imposed, and dismiss the indictment." *United States v. Oliva*, 909 F.3d 1292, 1298 (11th Cir. 2018). The Sixth Amendment right to a speedy trial attaches at indictment, arrest, or when the defendant is otherwise officially accused and continues until the trial date. *United States v. Gonzalez*, 671 F.2d 441, 444 (11th Cir. 1982).

To determine whether a defendant has been deprived of his constitutional right to a speedy trial, the Court considers the *Barker*[19] factors: (1) whether the

---

[19] *See Barker v. Wingo*, 407 U.S. 514, 530 (1972).

delay before trial was uncommonly long; (2) whether the government or the defendant is more to blame for that delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice as a result of the delay. *See United States v. Harris*, 376 F. 3d 1282, 1290 (11th Cir. 2004) (citing *Doggett v. United States*, 505 U.S. 647, 651 (1992)). "The first factor, length of the delay, serves a triggering function: it must first be satisfied for the court to analyze the other factors." *Oliva*, 909 F.3d at 1298 (noting that "a post-indictment delay exceeding one year is generally sufficient to trigger the analysis"). As to this first factor, while excessive delay "cannot alone carry a Sixth Amendment claim," its "importance increases with the length of the delay." *Doggett*, 505 U.S. at 656.

In considering the *Barker* factors, courts must "engage in a difficult and sensitive balancing process," bearing in mind that "none of the four factors . . . [are] a necessary or sufficient condition" to finding a Sixth Amendment violation. *Barker*, 407 U.S. at 533.  Although this is a case-specific balancing act, courts have provided some guidance for weighing the factors under different circumstances. For example, "if the first three factors 'weigh heavily against' the Government, the defendant need not show actual prejudice, the fourth factor." *Oliva*, 909 F.3d at 1298 (citing *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006)). And in some scenarios, one factor may outweigh all others and be determinative. *See, e.g., United States v. Muhtorov*, 20 F.4th 558, 658 (10th Cir. 2021) (concluding that the second factor outweighed the other factors in a highly complex case where

pretrial delay was over six years). That said, "[a] defendant generally cannot establish a Sixth Amendment speedy trial claim, however long the delay, if the government pursued the prosecution with reasonable diligence, and the defendant fails to show that the delay resulted in specific prejudice to his defense." *Harris*, 376 F.3d at 1290 (citation and internal quote marks omitted).

Whether the Government has violated a defendant's Sixth Amendment right to a speedy trial is a mixed question of law and fact. *Oliva*, 909 F.3d at 1301.

### B.    Whether Defendants' Sixth Amendment Rights Have Been Violated

The Court considers the four *Barker* factors below. Ultimately, the Court concludes that the first, third, and fourth factors weigh significantly in favor of dismissal. The second factor, while a closer call, still weighs slightly in favor of dismissal. As a result, the Court finds that the Government has violated Defendants Sixth Amendment speedy trial rights.

### 1.  Whether the Delay Has Been Uncommonly Long

Mr. Holland was first indicted in January 2017, over eight years ago. Mr. Moore and Mr. Cota were indicted in September 2017, over seven-and-a-half years ago. Even acknowledging that this matter is complex, seven or eight years is an extraordinary length of time for Defendants to be under indictment, unable to work in their chosen field, and dedicating significant time and resources to their criminal defense.

As the Court found in 2022, the first *Barker* factor—whether the delay has been uncommonly long—is met. *See Oliva*, 909 F.3d at 1298 (noting that "a post-

indictment delay exceeding one year is generally sufficient" to establish the first factor); *Ingram*, 446 F.3d at 1336 ("Delays exceeding one year are generally found to be presumptively prejudicial.") (quotation and citation omitted). Now, after two-and-a-half more years, the length of the delay only weighs heavier against the Government. *See Doggett*, 505 U.S. at 656 (explaining that the "importance [of an excessive delay] increases with the length of the delay").

### 2. Whether the Government or the Defendants Are More to Blame for the Delay

In assessing the second factor, courts look to the reasons for the delay. On one end of the spectrum, deliberate attempts to delay trial, or bad faith tactics, should be weighed heavily against the government. *Barker*, 407 U.S. at 531. More neutral reasons, such as negligence or overcrowded courts, should still be weighed against the government, but less heavily. *Id.* On the other end of the spectrum, particularly valid reasons—like a defendant who has evaded arrest or a crucial missing witness—may constitute valid reasons that justify the government's delay. *Id.*

That said, in weighing the reasons for the delay, courts must remember that "[b]ecause the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner . . . the burden is on the prosecution to explain the cause of the delay." *United States v. Ingram*, 446 F.3d 1332, 1337 (11th Cir. 2006) (internal quotation omitted). For this reason, a defendant need not show that the government acted in bad faith for this factor to weigh against the government. So although negligence should be weighed more

lightly than a deliberate attempt to delay, "it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Doggett*, 505 U.S. at 657.

In this case, the reasons for delay are many: the Government's initial filing of this case in Florida, the extensive litigation of numerous issues, the Government's strategy of seeking to introduce the out-of-court statements of numerous alleged coconspirator statements through two Government cooperators rather than by calling the declarants as witnesses, the disruptive impact of the COVID-19 pandemic, Court delay, and an interlocutory appeal that delayed the case for nearly two years.

In its prior Order, the Court found that this factor was generally neutral because both sides were somewhat responsible for the delay. In evaluating the present motions, the Court has conducted a more comprehensive review of the procedural events and reasons for delay, aided by additional arguments from counsel. In addition, circumstances have changed in the two-and-a-half years since the Court last reviewed this issue, and subsequent events have provided a clearer picture of the full litigation history.

As the Court discussed in its prior speedy trial order (Doc. 617-1) and *supra* at Section II.C. at 32–33, the Government's decision to initially indict this case in Florida—despite investigating this case and litigating related criminal and civil cases in Atlanta for years—smells of forum-shopping. The Government has provided no reasonable basis for this charging decision. This six-month delay at

the outset of the case is therefore directly attributable to the Government. In addition, after the case was transferred to this district in June 2017, the Government then put the case on hold while determining whether to issue a second superseding indictment.[20] This delay is also attributable to the Government, considering that the Government had already investigated this matter for many years.

In addition to the initial delay caused by the Florida foray, significant motions practice has caused delay. To be sure, both sides have vigorously litigated the issues, and taken questionable stances in this case. The Government sought to include allegations about patient harm that the parties litigated for many months and that the Court ultimately deemed inadmissible and unsupported by viable evidence. *See supra* n.14 (citing Doc. 446 at 60–66). The Government's insistence on including these allegations—despite that they were not relevant to the charges, that there was little to no evidence supporting these allegations, and that the allegations were so different from the facts of any case the Government cited in support—contributed to the delay. *Id*. And Defendants, for their part, filed a handful of unnecessary motions in the early stages of this case.[21]

---

[20] Judge Salinas stayed ruling on a handful of pending motions while the Government considered whether to issue a second superseding indictment. (8/1/17 Tr., Doc. 600 p. 3–8). The Government issued the Second Superseding Indictment on September 26, 2017. (Doc. 121).

[21] Both sides were successful on some motions. Defendants successfully excluded the Government's allegations of patient harm (Doc. 446); successfully fought venue on Count 10 (Doc. 334); and successfully challenged the testimony of one of the Government's

Despite both sides' zealous litigation, one set of issues caused more delay than all the rest—the Government's naming of 55 coconspirators and attempts to introduce approximately 83 out-of-court statements under Rule 801(d)(2)(E).

As detailed in Section I.E., the Government's strategy was highly irregular, first in the extensive number alleged unindicted coconspirators it named. This decision to name so many unindicted coconspirators caused serious delay. At the outset, the Government provided no information as to why it included the names it did, and no information about how many alleged conspiracies existed and what evidence supported those conspiracies. Further, the Government's naming of so many unindicted coconspirators effectively blocked defense counsel's access to these witnesses for years, as defense counsel has explained:

> Some of them had talked to us early on. But once they got wind of the fact . . . that the Government was considering them unindicted coconspirators and put that label on them, they shut up. They won't talk to us any more . . . . They still—they maintain the same thing. They won't talk to us. We haven't talked to every one of them recently. But particularly the ones with a lot of testimony, the declarants won't talk to us.

(10/3/19 Tr., Doc. 25 p. 25).

The Government's strategy of naming 55 coconspirators was particularly questionable considering that the Government never advised any of these individuals—at the time of their interviews or grand jury testimony—that they were targets or subjects rather than witnesses. (*Id*. p. 38). In this way, the Government's

---

experts, Dr. Bolan (Doc. 446). The Government also prevailed in defeating a number of Defendants' motions.

actions appear to have been inconsistent with the guidelines provided in the DOJ Manual, which instructs that the Government should advise individuals that they are potential subjects or targets of an investigation before the provision of grand jury testimony. *See* DOJ Manual 9-11.151 ("It is the policy of the Department of Justice to advise a grand jury witness of his or her rights if such witness is a 'target' or 'subject' of a grand jury investigation."). If these 55 individuals had been told that they were potential targets or subjects, they might not have testified before the grand jury. (*Id.* p. 39). But because the Government told these individuals that they were witnesses, and only later identified them as unindicted coconspirators, these witnesses were willing to provide testimony before the grand jury but have since become unwilling to talk to or testify for the defense for fear of prosecution. (*Id.* p. 40). And because the witnesses provided grand jury testimony, the Government can, if permitted by the Court, introduce selective statements made before the grand jury without providing the full context of the statement—leaving Defendants with no way to rebut the selectively chosen statement or provide full context for the statement.[22]

---

[22] In the event the declarants do not testify, Defendants would not be permitted to cross-examine, or even provide the context relevant to the statements introduced by the Government. According to Defendants, for some witnesses, that context includes hundreds of pages of grand jury testimony full of exculpatory information. (10/3/19 Hearing Tr., Doc. 447 p. 79, 82). For example, the Government seeks to introduce selective statements from K.W. but, if the Government is so permitted, there will be no way for the jury to hear K.W.'s testimony explaining her statements and actions—testimony which is allegedly inconsistent with the Government's theory. (*Id.* p. 76–79).

Considering these practical trial considerations, the Government's decision to name such an extraordinary number of coconspirators spawned a series of lengthy hearings and rounds of briefing that slowed the case for months and even years. And when the Court ultimately ordered the Government to identify the specific declarants and 801(d)(2)(E) statements it would seek to introduce, the Government only identified 11 (of the 55) declarants. In addition, the Government ultimately acknowledged in October 2019 that the 55 individuals could not be subject to prosecution for past events because the statute of limitations had run. (*Id*. p. 55, 58). That said, while the Government acknowledged that the statute of limitations had run, it never acknowledged that any of the 55 individuals were improperly named as coconspirators. Given the way the Government has handled this matter, witnesses may understandably still hesitate to talk to defense counsel, considering any possible reputational or associational harms.

In the end, this series of events leaves the Court with serious questions about the reasons behind the Government's initial strategic decision to name so many unindicted coconspirators. Some actions—the failure to identify any individuals as subjects or targets before naming them as coconspirators and the sheer number of named coconspirators compared to the 11 declarants ultimately identified—at least suggest that the Government was either overreaching at the outset, or that it listed so many coconspirators for the purpose of blocking Defendants' access to witnesses.

Even after the Government pared down its list, it still sought to introduce approximately 83 statements under Rule 801(d)(2)(E). Again, the extensive number of statements complicated the proceedings because it required defense counsel and the Court to review each of those statements separately, and separately as to each Defendant, to determine admissibility. This complexity required extensive briefing and review by the Court.[23] Nor did the Government present sufficient information to determine admissibility in its initial identification of statements and related briefing, so the Court was required to order a *second, more thorough* round of briefing. Finally, throughout all of this, the Government repeatedly presented the Court with the incorrect legal standard for its request. While the Court does not directly blame the Government for failing to identify a legal standard that no one else raised, the reality is that the Government's failure to argue the correct standard (in support of its request) resulted in a delay of the

---

[23] The nature of some of the statements also required extensive review. For example, one declarant is E.L. In its list of statements, the Government disclosed that it would seek to introduce evidence that E.L. participated in the AKS conspiracy. (Doc. 485 at ECF 36–38). The evidence the Government supplied in support is an FBI 302 report from interviews with Tracey Cota. (*Id.*) While Ms. Cota's 302 includes some direct statements that E.L. allegedly made to her, much of the information involves what Ms. Cota *believed or suspected* that E.L. knew or thought. (*Id.*) (noting that, according to Ms. Cota, E.L. "understood 'the whole' [Clinica] relationship, meaning that she knew the relationship was about delivery admissions and that [Clinica] was not just a provider/vendor of services," and E.L. "knew that adding a translation service to the hospital would not attract new patients. . . ."). Even under Rule 801(d)(2)(E), Ms. Cota could not testify about what she believed another person knew or thought. From its list, it is not clear whether the Government intends to have Ms. Cota testify about other individuals' knowledge and thoughts. This lack of clarity further complicated the Court's review.

50

case that lasted years more. And even now, the delay caused by the 801(d)(2)(E) issues has not yet been resolved and requires further extensive Court review.

In sum, even before the appeal, the Government's strategy of (1) naming 55 unindicted coconspirators and (2) seeking to introduce nearly 85 out-of-court statements through two cooperating Government witnesses caused years of delay in this case. Put simply, this strategy was highly irregular. In addition, the sheer number of unindicted coconspirators and alleged 801(d)(2)(E) statements made these disputes even more complex, particularly where the Government did not offer sufficient information for the Court to evaluate the admissibility of these statements under the standard all parties argued applied.

As to the appeal, in weighing the impact of delay caused by an interlocutory appeal by the Government, courts look to the purpose and reasonableness of the appeal. *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). While an interlocutory appeal by the Government is *ordinarily* a valid reason that justifies delay, certain considerations may rebut that general presumption. *Id.* In assessing the purpose and reasonableness of the appeal, courts consider (1) the strength of the Government's position on the appealed issue, (2) the importance of the issue in the posture of the case, and (3) the seriousness of the crime. *Id.* "For example, a delay resulting from an appeal would weigh heavily against the Government if the issue were clearly tangential or frivolous." *Id.* And the charged offense must be "sufficiently serious to justify restraints that may be imposed on the defendant pending the outcome of the appeal." *Id.*

51

Here, a review of the first factor is not clear-cut. While the Government prevailed on the appeal, it was *not* because of the strength of the Government's position. The Government's entire theory of admissibility of the 801(d)(2)(E) statements—and the arguments it raised before this Court and the Eleventh Circuit—did not win the day. That said, the Government did obtain a reversal and remand of the Court's decision, albeit one that requires even more briefing and argument. Accordingly, this factor does not weigh strongly in favor or against the reasonableness of the appeal.

The second factor is the importance of the issue in the posture of the case. *Loud Hawk*, 474 U.S. at 315. At its core, the Government appealed a non-dispositive evidentiary ruling. This was not a situation, like in *Loud Hawk* itself, where the Government appealed a dispositive decision, such as the dismissal of charges with prejudice. *Id.* at 308–09.  Rather, the Government appealed an evidentiary issue where it had options to introduce the same evidence by other means. First, the Government could simply have called the nine other declarants themselves as witnesses at trial. As the Government acknowledged, these individuals are not now in danger of prosecution since the statute of limitations has long run. Second, by its own assertion, the Government could have introduced many of these statements via other rules:

> The United States notes that numerous Noticed Statements have independent legal bases for admission. Some Noticed Statements, for example, may be offered for the truth of the matter asserted under Rule 801(d)(2)(E) or to prove the state of mind of Defendants if received by Defendants, or both. Other Noticed Statements may be

> offered under alternative Rules, such as under Rule 801(d)(2)(C) or Rule 801(d)(2)(D), or for non-hearsay purposes unrelated to the truth of the matter asserted.

(*See* Notice of Statements, Doc. 485 at 30). Accordingly, the Government had other options for introducing the statements that did not involve appealing the 802(d)(2)(E) ruling.

The Government's decision to appeal this non-dispositive evidentiary ruling (rather than pursuing other options for admissibility) must be viewed in context. At the time the Government appealed, Defendants had already raised serious and compelling speedy trial concerns in their 2022 speedy trial motions. (Docs. 579, 581, 582). Considering these filings, the Government was on notice of the danger that further delay could result in the violation of Defendants' speedy trial rights. Ultimately, the 22-month delay that resulted from the Government's appeal would not have occurred if the Government had decided to pursue another evidentiary avenue for introducing the statements. Under the particular circumstances here, this second factor weighs against the reasonableness of the appeal.

On the third factor, while the crimes here are serious, their relative seriousness does not justify the nearly two-year delay caused by appeal of the evidentiary issues here. As discussed, the charges here do not involve any allegations that the Defendants individually profited off the alleged conspiracy or that the Government paid for services that were not provided. There are also no admissible or colorable allegations of patient harm. *See supra* n.14. Additionally, the Defendants' ties to the hospital chain had long been severed and there was not

an iota of evidence that Defendants presented a current or future threat to the nation's health care system or the public. While the "restraints imposed on the Defendants" did not involve incarceration, those restraints included years more of living under indictment, unable to work, while dedicating considerable time and resources to their defense. This factor weighs against the reasonableness of the appeal.

Considering the particular circumstances here, the Government's decision to appeal was not fully reasonable. While the Court does not weigh this appeal heavily against the Government, it does further compound the lengthy delay caused by the Government's litigation strategy surrounding the naming of unindicted coconspirators and seeking introduction of approximately 85 Rule 801(d)(2)(E) statements in place of calling witnesses to testify in person.

In the end, the second *Barker* factor—the reasons for the delay—weighs slightly in favor of Defendants. To be sure, both sides engaged in extensive litigation of the issues—unsurprising in this complex case. But most of the delay in this case was caused by the Government's unexplainable decision to bring the case in Florida as well as the Government's overall litigation strategy and tactics involving coconspirator and Rule 801(d)(2)(E) issues. The Government must live with the strategic decisions it made when prosecuting this case for the past eight years.

### 3. Whether Defendants Have Asserted Their Rights to Speedy Trials

"A defendant has no duty to bring himself to trial" and a defendant who fails to demand a speedy trial does not waive his Sixth Amendment right. *Barker*, 407 U.S. at 527. Even so, courts consider a defendant's assertion of his right as one factor in assessing whether the defendant's speedy trial rights have been violated. *Id.* at 528. The Supreme Court has recognized that "[t]he more serious the deprivation" of the speedy trial right, "the more likely a defendant is to complain." *Id.* at 531. For this reason, a defendant's "assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 532. On the flipside, a defendant's failure to assert his speedy trial right makes it more difficult for him to prove a speedy trial violation. *Id.*

Here, all Defendants have asserted their speedy trial rights multiple times. Mr. Holland first asserted his right in his 2018 motion to dismiss for constitutional speedy trial violations. (Doc. 180). All three Defendants asserted their rights when they moved to dismiss for speedy trial violations in October 2022. (Docs. 581, 582, 585). Defendants again asserted their speedy trial rights in their most recent speedy trial motions. (Docs. 675, 677, 679).

These filings show that Defendants have asserted their speedy trial rights for years. After Defendants filed their comprehensive speedy trial motions in 2022, the Government did not bring the case to trial with haste. Instead, the Government chose to pursue an appeal a non-dispositive evidentiary issue, thereby slowing the

case for years longer. Under the circumstances, this factor supports Defendants and a finding that their speedy trial rights have been violated.

### 4. Whether Defendants have Suffered Prejudice as a Result of the Delay

Courts determine whether a defendant is prejudiced by a delay by examining three interests of defendants which the speedy trial clause is meant to protect. These three interests are: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532.

The most important of these interests is the third "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*. For example, if "witnesses die or disappear during a delay, the prejudice is obvious." *Id*.; *see also United States v. Edwards*, 577 F.2d 883, 890 (11th Cir. 1978) ("The death of a material defense witness during an unexcused period of prosecutorial delay obviously may prejudicially affect a defendant's case."). There is also prejudice where "defense witnesses are unable to recall accurately events of the distant past." *Barker,* 407 U.S. at 532.

That said, in establishing prejudice, a defendant must demonstrate how unavailable testimony, or other evidence, would materially aid his case. *See Turner v. Estelle*, 515 F.2d 853, 860 (5th Cir. 1975) ("By failing to demonstrate how the testimony and records would have materially aided his case, [the defendant] has failed to establish prejudice from the delay in bringing him to trial."). In other words, a defendant "must show that the loss [of evidence] impaired his ability to

56

provide a meaningful defense." *United States v. Solomon*, 686 F.2d 863, 872 (11th Cir. 1982) (in case involving Fifth Amendment due process pre-indictment delay). In demonstrating that his ability to prepare an effective defense has been hampered, a defendant must offer more than "mere conclusory allegations of impairment." *United States v. Clark*, 83 F.3d 1350, 1354 (11th Cir. 1996).

Even acknowledging that a defendant must show *how* the loss of evidence has impaired his defense, courts recognize that an *excessive* delay "presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett,* 505 U.S. at 655. For this reason, a defendant's requirement of showing specific prejudice is reduced where the delay is oppressively lengthy. *Id.* (excusing a defendant's failure to "to make any affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence" in the face of an eight-and-a-half-year delay).

Here, Defendants first claim that they have suffered specific prejudice because four witnesses have died and a fifth has become unavailable.

The most important of these witnesses is Bill Tinsley, who died in February 2024. Mr. Tinsley was the lawyer retained by Tracey Cota to draft and review Clinica's contracts with Tenet and its lawyers. (*See* Cota 302 Report, Doc. 724-6 at ECF 9 ("Tinsley worked directly with Tenet's attorneys to construct the deal.").[24]

---

[24] None of the lawyers involved in developing the contracts were charged or named as unindicted coconspirators.

Mr. Tinsley provided attorney opinion to both Ms. Cota and Mr. Holland about the legality of the Clinica contracts. Mr. Tinsley was aware that Clinica intended to refer patients to North Fulton. (*See* 302 Report, Doc. 520-3 at 3 ("Cota advised that Tinsley knew that the arrangement included referrals . . . because she told him that they were doing just that; referring patients."); Cota Interview Notes, Doc. 724-7 at ECF 17 ("[S]he mentioned to Tinsley that it was a referral based [contract.] There was [a] handwritten note that she faxed to Tinsley that it was a referral.")).

Evidence in the record shows that Mr. Tinsley had numerous conversations with Mr. Holland about the contracts, some of which appear to be conversations that Ms. Cota was not party to. (*See* 302 Report, Doc. 520-3 at 2 ("Cota advised that she was not aware of the conversation between [Tinsley and Holland]."); Cota Interview Notes, Doc. 724-7 at ECF 16 ("Not sure of what Tinsley conversation with Holland.")). Evidence also shows that Mr. Tinsley was knowledgeable about the requirements of the AKS, as he directly advised Ms. Cota about what could not lawfully be included in the contract—transportation services or any agreement that Clinica receive a percentage of collections for billing Medicaid patients. (Doc. 520-3 at 2–4) ("Cota was told by Tinsley that they could not provide transportation to the hospital . . ."). It appears Mr. Tinsley, in a January 17, 2001 email to Mr. Holland, advised that he believed that the Clinica/North Fulton contract complied with the applicable AKS Safe Harbor provision. (*See* Def. Mot., Doc. 520 at ECF 20 (citing 302 Report, Doc. 520-3 at ECF 3); *see also* Interview Notes, Doc. 724-7 at ECF 17 ("It complies with the AKS safe harbors.")). (*See also* Declaration of

Richard H. Deane, Jr., Doc. 715-1 ¶¶ 3–4) (stating that defense counsel intended to call Mr. Tinsley as a witness, and that, based on multiple conversations, Mr. Tinsley stressed his belief that the contracts were lawful and that he did not understand why Tracey Cota pled or believed she had done anything illegal); (Tracey Cota Interview Notes, Doc. 724-7 at ECF 16 ("Tracey did not think about it being illegal as she had Tinsley . . . .").

Defendants have stated that they intend to present an affirmative defense of reliance on advice of counsel.  Reliance on counsel's advice can "negate[] the mens rea element of willfulness." *United States v. Petrie*, 302 F.3d 1280, 1287 n. 6 (11th Cir. 2002). The elements of this affirmative defense are: "(1) [the defendant] fully disclosed to his attorney all material facts that are relevant to the advice for which he consulted the attorney; and (2) thereafter, he relied in good faith on the advice given by his attorney." *United States v. Hill*, 643 F.3d 807, 851 (11th Cir. 2011). As good faith reliance is an affirmative defense, a defendant bears the burden of proof on the issue. *See United States v. Eisenstein*, 731 F.2d 1540, 1543–44 (11th Cir. 1984).

Besides arguing this affirmative defense, Defendants separately contend that they can show lack of criminal intent based on a general good-faith defense that would rely in part on evidence that they were told by lawyers (specifically Mr. Tinsley) that the Clinica contracts were lawful. *See Cheek v. United States*, 498 U.S. 192, 201–04 (1991) (explaining that statutory willfulness element requires proof of an intentional wrongful act and that a defendant who believes in good faith

59

that he has not committed a wrongful act is not guilty, whether or not the defendant's belief is objectively reasonable); *United States v. Barker*, 19 F.3d 605, 612 (11th Cir. 1994) (in case involving good faith defense, explaining that the jury was correctly instructed that "good faith is a complete defense . . . since good faith on the part of the defendant is inconsistent with intent to defraud or willfulness, which is an essential part of the charges."). According to Defendants, Mr. Tinsley's testimony would have supported both of these defenses. (*See generally* Deane Decl., Doc. 715-1; Hall Decl., Doc. 715-2).

As Mr. Tinsley has passed away, he can no longer testify about conversations he had with Ms. Cota and Mr. Holland wherein he, according to Defendants, advised that the Clinica contracts were legal because they fell into the safe harbor provision of the AKS. As noted above, at least some documentary evidence shows that Mr. Tinsley had conversations with Mr. Holland that Ms. Cota was not party to. Presuming Mr. Holland does not testify, there is no other source of the information discussed during these conversations. As to conversations where Ms. Cota was present, Mr. Tinsley will not be able to rebut or fill in gaps about the testimony of Ms. Cota, as the evidence suggests that he would have.

There is some documentation that speaks to Mr. Tinsley's knowledge of the Clinica contracts and his advice. But first, Mr. Tinsley can no longer provide the foundation for these documents. While some of these documents may be introduced through Ms. Cota, the presentation will undoubtedly be very different coming through a Government witness who is seeking a Government

recommendation for "substantial assistance" rather than a defense witness and attorney who can directly speak about documents he wrote or reviewed. Second, the paper documents cannot fully encompass Mr. Tinsley's full understanding and advice about the contracts considering his important role in the process. The impact on the jury of a live attorney witness is a far cry from the introduction of faceless documents. In short, the absence of Mr. Tinsley testifying on the stand is clearly materially detrimental to both Defendants' advice of counsel affirmative defense and their good-faith lack of criminal intent argument.

The Government's attempts to downplay Mr. Tinsley's importance, or to recast the nature of his previously anticipated testimony, are unpersuasive. The Government argues that the documents in evidence are sufficient to encapsulate Mr. Tinsley's positions. Yet this contention ignores the oral discussions Mr. Tinsley had with Mr. Holland and Ms. Cota and also ignores the very real difference between trial testimony involving a live witness and the presentation of documents. Considering his important role, the documents cannot effectively speak for Mr. Tinsley.

The Government also argues that Mr. Tinsley was not aware of all terms of the Clinica/North Fulton contract. But documentary evidence, and attorney declarations, suggest otherwise. (*See* Doc. 520-3 at 3) ("Cota advised that Tinsley knew that the arrangement included referrals . . . because she told him that they were doing just that; referring patients."); (*see generally* Deane Decl., Doc. 715-1; Hall Decl., Doc. 715-2). Moreover, this argument from the Government highlights

why Mr. Tinsley's absence is such a loss to the fact-finding process—because he cannot be here to explain exactly what he was aware of when he gave his legal advice. Finally, the Government suggests that Mr. Tinsley's absence has disadvantaged the prosecution, rather than the defense. There is no evidence in the record to support this conclusion. Rather, the evidence indicates that Mr. Tinsley planned to testify for the defense, to testify to his belief that the contracts were lawful, and to testify that Tracey Cota disclosed all material aspects of the contracts to him. (*See generally* Deane Decl., Doc. 715-1; Hall Decl., Doc. 715-2). The loss of his testimony is a serious disadvantage to the defense. Moreover, regardless of which side is disadvantaged, the Government's argument on this front merely highlights why Mr. Tinsley's absence is so significant. He was a key witness, with information relevant, and perhaps crucial, to Defendants' trial arguments. Based on the record before the Court, Defendants will suffer serious prejudice in the loss of Mr. Tinsley as a key defense witness.

The next lost witness is Tom Crane, an expert witness that Mr. Holland intended to call. (*See* Holland's Intended Draft Rule 16 Disclosure, Doc. 698-1). While Mr. Crane is still alive, he has retired and is no longer willing to serve as an expert witness in this case. (*See* Holland Reply, Doc. 698 at 9). Mr. Crane was an attorney with the Department of Health and Human Services (HHS) who was the principal author of the Anti-Kickback Statute "safe harbor" provisions, 42 C.F.R. 1001.952, at issue here. (*See* Doc. 698-1). Beyond writing the provisions, he trained lawyers and other members of the healthcare industry on how these provisions

worked. (Holland Reply, Doc. 698 at 9). Mr. Holland represents that Mr. Crane would have testified:

- that referral source contracts were common and were not per se forbidden under the AKS;

- that the safe harbor provisions were intended to insulate from criminal liability innocuous arrangements with referral sources;

- that the relevant safe harbor provision was intended to give health care providers certainty that they could enter into contracts with potential referral sources and not be afraid of breaking the law;

- that, if you met the safe harbor requirements, then a payment under the contract was not "renumeration" covered by the AKS and therefore was not criminal;

- to the meaning of specific language in the safe harbor provision: that the phrase that compensation not be "determined in a manner that takes into account the volume or value of any referrals" means that the compensation does not factor in a percentage of the value obtained from the referral.[25]

Mr. Holland contends that, because Mr. Crane "wrote the book" on the particular safe harbor provisions at issue, his testimony would have been particularly persuasive to the jury. (Holland Reply, Doc. 698 at 10). Mr. Holland is in in the process of finding a replacement expert witness. (*Id.*)

The Government argues that the loss of Mr. Crane as a defense witness is not prejudicial because Mr. Crane's proposed testimony would not be admissible

---

[25] In order to fall within the safe harbor provisions, a series of conditions must be met. One is that, for a services contract, "[t]he methodology for determining the compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs." 42 C.F.R. 1001.952(d)(1)(iv).

because an expert cannot testify to legal conclusions. (Gov. Resp., Doc. 687 at 28). The Government's argument oversimplifies the issue. Yes, Mr. Crane would not have been able to testify to the ultimate legal issue of whether Defendants violated the AKS. But if he were found to be an appropriate industry expert, he would have been able to testify about relevant customs and practices in the healthcare industry—for example, whether referral contracts were common or ever lawfully used. *See Suter v. Gen. Accident Ins. Co. of Am.*, 424 F. Supp. 2d 781, 792- 93 (D.N.J. 2006) (finding that industry expert did not provide impermissible legal conclusions where he did not testify to what the law requires but rather "touche[d] upon what a person familiar with the custom of the [] industry would believe to be the impact of the law upon the business") ("Where an expert is opining as to the custom and practice of a particular business, and where someone who is an expert in a particular field would be expected to understand the ways in which the laws affect the business, such testimony should be admitted."); *Bacchi v. Massachusetts Mut. Life Ins. Co.*, 2016 WL 1170958, at *3 (D. Mass. Mar. 23, 2016) (same, noting that the expert may testify about industry practice, but not about what the law requires); *United States v. Crinel*, 2016 WL 6441249, at *10 & n. 109 (E.D. La. Nov. 1, 2016) ("A qualified expert may testify regarding an industry's custom or practices so long as the testimony does not cross 'into the realm of making legal conclusions.'") (quotation omitted).

Considering this authority, it appears that, while Mr. Crane would likely not have been able to testify to everything that Defendants proposed—such as the

legislative intent behind the safe harbor provisions—he would have been able to testify to relevant industry standards and practices. Further, while Mr. Holland explains that he is looking for a replacement, Mr. Crane was clearly his preferred expert and one who was perfectly suited in his professional background to give relevant and helpful testimony to the jury. Under the circumstances, the loss of Mr. Crane is moderately prejudicial to Mr. Holland.

The next three lost witnesses are Dennis Phillips, Britt Reynolds, and Richard Fiske—all of whom were primarily character witnesses for Mr. Holland and all of whom have passed away during the pendency of this case. Mr. Phillips was a colleague, mentor, and boss to Mr. Holland. Mr. Reynolds was Tenet's COO and Mr. Holland's immediate supervisor when Mr. Holland was Regional VP at Tenet. Mr. Fiske was a mentor, colleague, and close friend of Mr. Holland. Defendant contends that each of these individuals would have provided compelling testimony about Mr. Holland's character, his legal and business compliance efforts, and his professionalism in the workplace.

As these individuals were primarily character witnesses, the loss of their testimony alone is not overwhelmingly prejudicial. That said, as Mr. Holland points out, one of the fundamental issues at trial will be whether Defendants harbored the criminal intent to violate the law. And so evidence of Mr. Holland's character—especially from individuals who worked with or supervised him in the healthcare industry—would have been important, particularly in the context of a jury trial. *See United States v. Adamson*, 665 F.2d 649, 660 (5th Cir. 1982),

(explaining that good character evidence was admissible to negate inference that defendant had requisite criminal intent) *on reh'g*, 700 F.2d 953 (5th Cir. 1983). *See also* Fed. R. Evid. 404(a)(2)(A) ("[A] defendant [in a criminal case] may offer evidence of the defendant's pertinent [character] trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it").

In sum, Defendants have identified five lost witnesses who would have testified for the defense at trial. Through evidence, argument, and affidavits, Defendants have shown that the loss of Mr. Tinsley, in particular, will impair their advice of counsel affirmative defense and their good faith argument on intent and therefore impair their "ability to provide a meaningful defense." *Solomon*, 686 F.2d at 872. Added to this are the other lost witnesses. While less significant, the loss of Mr. Holland's industry expert and his character witness adds to the prejudice pile, further diminishing Defendants' ability to provide a robust defense.

In addition to lost witnesses, the lengthy prosecution of this case has resulted in the loss of the FBI notes from Tracey Cota's first interview with the Government—an interview that occurred before she was given the opportunity to provide a proffer. (Moore Reply, Doc. 729 at 2). As discussed *supra* at Section II.C. at 36–38, the Court can reasonably infer that this lost set of notes might contain at least some exculpatory information, since the notes that have already been provided contain exculpatory information. *See supra* at n.17. As the Court highlighted before, even though there is now only one set of missing notes, they are relevant since (1) Tracey Cota is likely the key Government witness and (2) her

story changed and developed over the course of the 18 interviews she gave to the Government. Any evidence from this first, unvarnished pre-proffer interview that is inconsistent with the 302 reports, the Government's theory, or Ms. Cota's other testimony would be relevant to the defense. Even if the lost notes contain only one piece of exculpatory information, the absence of this set of notes adds at least some additional prejudice, on top of the prejudice already discussed. Further, as the Court explained in Section II.C. at 36–38, the manner in which the Government handled the production of these interview notes is symptomatic of the problems that arise when prosecution of a complex criminal case has taken this long, and when a case has been passed from prosecutor to prosecutor. As these important interview notes were nearly lost, the Court cannot be certain that other evidence has not likewise fallen through the cracks.

In addition to lost witnesses and a lost set of notes, the delay here has also likely led to lost memories. *Barker,* 407 U.S. at 532 (noting that prejudice also exists where "defense witnesses are unable to recall accurately events of the distant past"). The events of this case took place from 2000-2013 (*see* Second Superseding Indictment, Doc. 121)—between 12 and 25 years ago. That length of time between the relevant events and trial inevitably leads to diminished memories. *See De La Torre*, 2022 WL 20538953, at *18 ("To say memories have dimmed is an understatement [where allegations went back to 1999] . . . which may not seem like the distant past until one realizes that the alleged conspiracies began before our nation elected its first Black President."); *United States v. Zapata*, 2022 WL

2134302, at *5 (S.D. Fla. May 13, 2022) (noting that "time erodes memory" and makes discoverable exculpatory evidence difficult to recover"), *report and recommendation adopted*, 2022 WL 2132094 (S.D. Fla. June 14, 2022).

While defense witnesses will be subject to the natural impact of time on memory, the Government would likely not suffer similar prejudice, if the Court were to allow the Government to introduce 801(d)(2)(E) statements via a chosen witness (like Tracey Cota). Under such circumstances, that testimony from Ms. Cota will not be impacted by time in the way testimony from a live witness would be. Put another way, the Government witness would be able to provide and explain statements of other individuals from years in the past, out of context, and without being pressed on her memory. In this way, the delay's impact on witness memories may likely prejudice the Defendants more than the Government.

The "possibility that the defense will be impaired" is the most significant factor courts consider when assessing whether a defendant has suffered prejudice. *Barker*, 407 U.S. at 532. Considering the prejudice caused by lost witnesses, lost evidence, and lost memories, Defendants have shown that the they have been prejudiced by the lengthy delay in this case.

While less significant, a court assessing whether a defendant has been prejudiced by a significant delay should also consider the anxiety and concern of the accused. *Barker*, 407 U.S. at 532.

"Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment,

drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *Betterman v. Montana*, 578 U.S. 437, 444 (2016) (quoting *United States v. Marion*, 404 U.S. 307, 320 (1971)). Here, while not incarcerated, Defendants have lost their jobs, livelihoods, and professional reputations during their prime working years. They have expended significant financial resources in support of their defense. These life disruptions have lasted for over eight years. As a result, this first factor adds weight on the scale to Defendants' prejudice argument. *See De La Torre*, 2022 WL20538953, at *18 (finding that prejudice to justify dismissal where the defendant "lost his source of income (and presumably lost his health insurance)[,] . . . [h]is family's name and reputation were besmirched[, and] a cloud of anxiety formed over [the defendant's] house" as a result of "the pain that flows from a public accusation of criminal misconduct"). Defendant Moore, who is 69 years old, has experienced the anxiety of indictment and criminal prosecution while he has suffered from a serious medical condition. (*See* Doc. 730). Mr. Holland is also no spring chicken, at age 68.

For all the above reasons, Defendants have shown that the significant post-indictment delay in this case has impaired their abilities to effectively present their cases in their defense, particularly in light of the five lost witnesses (especially Mr. Tinsley), a lost set of interview notes, and inevitable lost memories. The fourth *Barker* factor therefore weighs in favor of Defendants.

*** 

69

For the reasons above, the first, third, and fourth *Barker* factors weigh significantly in favor of a speedy trial violation. While the second factor is a closer call, it still weighs slightly in Defendants' favor. For these reasons, Defendants have established that the Government violated their Sixth Amendment speedy trial rights. As a result, for this separate reason, the Court must dismiss the case with prejudice.

**IV.   Conclusion**

After over ten years of investigations, and approximately eight years of Defendants living under criminal indictment, this case must end. The Government has not ultimately prosecuted this case consistent with the mandates of the Speedy Trial Act and the Sixth Amendment. To summarize the Court's rulings: first, the Government's and Defendant Moore's Motions for Leave to File Supplemental Briefs [Docs. 706, 724] are **GRANTED**. Second and more substantively, the Court concludes that the Government has violated Defendants rights under both the Speedy Trial Act and the Sixth Amendment. For these two independent reasons, this case is **DISMISSED WITH PREJUDICE**. The Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED** this 24th day of April 2025.

**Honorable Amy Totenberg**
**United States District Judge**

70